IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BECKY S. PALAMIDES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07-1696 |
| v. | ) | |
| | ) | |
| BOEHRINGER INGELHEIM | ) | |
| PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

## I.    Introduction

Pending before this court is the motion for summary judgment filed by defendant

Boehringer Ingelheim Phamaceuticals, Inc. ("BIPI") with respect to the claims asserted by

plaintiff Becky S. Palamides ("plaintiff") under the Age Discrimination in Employment Act, as

amended, 29 U.S.C. §§ 261 *et. seq.* ("ADEA") and the Pennsylvania Human Relations Act, 43

PA. CONS. STAT. §§ 951 *et. seq.* ("PHRA"). Plaintiff filed an Equal Employment Opportunity

Commission ("EEOC") charge on June 19, 2006 for age discrimination based on her termination

from BIPI and cross-filed that charge with the Pennsylvania Human Relations Commission.

(Pl.'s Dep. Ex. 42.)[1]


## II.    Factual Background

---

[1] PHRA claims are treated consistently with claims brought under federal anti-discrimination statutes.
Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 n.5 (3d Cir. 2006) (the analysis required for adjudicating
plaintiff's claim under the PHRA is identical to a Title VII inquiry); Goosby v. Johnson & Johnson Med., 228 F.3d
313 (3d Cir. 2000) (same); Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) (holding, in an ADEA
case, "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is
something specifically different in its language requiring that it be treated differently").  Here, neither party argues
that the PHRA requires a different analysis.  This court will not separately address plaintiff's claim under the PHRA.

BIPI manufactures and sells pharmaceuticals throughout the United States. (P.S.F. ¶ 1.)[2] BIPI's sales force is divided into regions. Each region is divided into districts and each district is divided into territories. (Id.) Plaintiff was interviewed by three district managers ("DMs"), Eugene Simeone, ("Simeone") Julie Rebel, ("Ms. Rebel") and Rob Vincent ("Vincent") as part of a mass hiring in July 2003 (P.S.F. ¶ 11.) On July 21, 2003, plaintiff was hired by BIPI as a pharmaceutical sales representative. (C.S.F. ¶ 1.)[3] At the time plaintiff was hired, she was forty-five years of age; her birthdate is May 9, 1958. (Id. ¶ 2.)

## A. Plaintiff's work assignments and supervisors

All BIPI sales representatives are subject to the BIPI Sales Employee Guide ("Guide"), which sets forth expectations about the performance of sales representatives. (P.S.F. ¶ 14.) The Guide provides that, "[n]ewly hired sales representatives are required to locate their residences inside the geographical boundaries of their territory, unless exempted by their Regional Director." (Id. ¶ 15.) Plaintiff was assigned to work in the Wheeling, West Virginia/Washington, Pennsylvania territory when she was first hired by BIPI. (C.S.F. ¶ 7.) Plaintiff reported to Ms. Rebel, her DM, when she was first hired by BIPI. (Id. ¶ 8.) Plaintiff resided in McMurray, Pennsylvania at the time she was hired. (P.S.F. ¶ 18.) Plaintiff alleges that she made a request to Simeone to be assigned to the Pittsburgh Southwest Territory in the Pittsburgh District where she resided when she was first hired. (Id. ¶ 19.) McMurray, Pennsylvania is located within the geographical boundaries of the Pittsburgh Southwest Territory, where she requested to be assigned because there was an opening in that territory. (Id. ¶ 18.) The Pittsburgh District is part of BIPI's Region 17. (Id. ¶ 1.) The Pittsburgh District is comprised of three territories; Pittsburgh Southwest, Pittsburgh Southeast and Pittsburgh City.

---

[2] "P.S.F." refers to the plaintiff's statement of material facts (ECF No. 72).
[3] "C.S.F." refers to the combined concise statement of undisputed material facts (ECF No. 77).

(Id. ¶ 2.)  Simeone indicated, however, that assignment to the Pittsburgh District was not an option.  (Id. ¶ 19.)

Chris Kyle ("Kyle") was the Region 17 human resources manager between January 1, 2003 and January 1, 2006. (Id. ¶ 4.)  Kyle testified that an assigned territory could be changed at any time, for any business need.  (Pl.'s App. (ECF No. 66), Ex. 7 ("Kyle Dep.") at 97-98.)  Plaintiff was still required to work in the Wheeling, West Virginia territory even though she lived outside of the territory and despite the requirement in the Guide that sales representatives reside in their assigned territories.

Vincent subsequently became plaintiff's DM. (C.S.F. ¶ 9.)  Vincent and Floyd asked plaintiff to take a newly created position in the Pittsburgh Southwest Territory for several reasons.  (Id. ¶ 11.)  Vincent believed that transferring plaintiff to the Pittsburgh Southwest Territory would reduce the amount of her travel time.  (Id.)  On January 18, 2005, plaintiff was transferred to the Pittsburgh Southwest Territory.  (Id. ¶ 10.)  Plaintiff transferred in order to take a new position that was created specifically to sell a new product that BIPI was expecting to be approved for sale by the Federal Drug Administration ("FDA").  (Id. ¶ 12.)  In this newly created position in the Pittsburgh Southwest Territory, plaintiff reported to Simeone as her DM.  (Id. ¶ 13.)  Plaintiff was hesitant about accepting this new position because she had learned from another employee that Simeone had made ageist comments in the past.  (Pl.'s App., Ex. 4 ("Pala. Dep.") at 86, 253.)

During the course of plaintiff's employment in the Pittsburgh Southwest Territory, Simeone appointed plaintiff to the position of HealthAmerica coordinator.  (C.S.F. ¶ 14.)  In late March 2005, BIPI learned that the product for which plaintiff's position was created was not approved for sale by the FDA.  (Id. ¶ 15.)  Thus, the territory could no longer support her

position and it was eliminated.  (Id.)  BIPI offered plaintiff the choice of transferring either to

Greensburg, Pennsylvania or to the Pittsburgh City Territory.  (Id.)  Plaintiff chose to transfer to

Pittsburgh City Territory, where she would continue to report to Simeone.  (Id.)  This transfer

was plaintiff's fourth transfer within the company in two years.  No other employee was

transferred as often as plaintiff.  (Pl.'s App., Ex. 10 ("Sim. Dep.") at 149.)

### B. Plaintiff's evaluations

"Sales representatives traveled with their DMs on a regular basis, at which time, both

positive and negative performance issues were documented in Field Contact Reports."  (P.S.F. ¶

31.)  Sales representatives also met with their DMs twice per year and received written

performance reviews.  (Id. ¶ 32.)  Plaintiff was assigned to a "geoteam" consisting of three or

four sales representatives who were accountable for meeting certain targets and goals.  (Id. ¶ 28.)

Plaintiff's geoteam "consistently met or exceeded their sales goals."  (Id. ¶ 29.)  In 2005, plaintiff

was the lead representative for the drugs Micardi and Spiriva and her geoteam reported

significant gains in sales for these two drugs.  (Id.)  As of October 2005, plaintiff's geoteam was

ranked fifth out of twenty-two teams and achieved a goal attainment of between 94% and 100%

for drugs it marketed.  (Id. ¶ 30.)  Plaintiff did not receive any negative feedback in either her

field contact reports or performance reviews before November 18, 2005.  (Id. ¶ 34.)  She was

never warned, reprimanded or disciplined in any manner prior to November 18, 2005.  (Id.)

Ms. Rebel nominated plaintiff for a Golden Achievement Award in 2004.  (Id. ¶ 35.)

Another DM, William Martin, nominated plaintiff for a Golden Achievement Award in 2005.

(Id. ¶ 36.)  "Simeone did not report any problems or deficiencies in plaintiff's performance or her

relationships with her geoteam as of October 19, 2005."  (Id. ¶ 37.)

### C. UPMC Update

The UPMC Update ("Update") is an annual seminar held for companies and persons in the medical field.  (C.S.F. ¶ 48.)  Pharmaceutical companies set up booths and take advantage of the opportunity to network with physicians and potential customers.  (Id.)  An Update took place on November 3 and 4, 2005, at the David L. Lawrence Convention Center in Pittsburgh, Pennsylvania.  (Id.)

Plaintiff was tasked with coordinating BIPI's participation in the event and, in particular, scheduling coverage of BIPI's booth by sales representatives throughout that Update.  (Id. ¶ 49.)  Plaintiff did not schedule herself to attend that Update.  (Id. ¶ 52.)  If any sales representative were unable to attend the conference, plaintiff was expected to attend in their place.  (P.S.F. ¶ 61.)

### D. Plaintiff's termination

The National Standards requires a sales representative to be physically located within his or her sales territory between the hours of 8:00 a.m. and 5:00 p.m., absent approval from the employee's DM.  (C.S.F. ¶ 24.)  On September 16, 2005, Simeone observed plaintiff at approximately 10:15 a.m. at her storage unit, which was located outside of her assigned sales territory.  (Id. ¶ 26.)  Plaintiff admits that Simeone told her that she was outside of her sales territory and needed to relocate her storage unit within her sales territory.  (Id. ¶¶ 26-27.)[4]

In the fall of 2005, a number of plaintiff's co-workers began raising concerns to Simeone with respect to plaintiff's job performance.  (Id. ¶ 25.)  Plaintiff was aware of some of the concerns raised by her co-workers.  (Id.)  Plaintiff was aware that some co-workers raised concerns about her leaving the territory early and failing to attend team meetings.  (Id.)  Plaintiff did not know prior to November 16, 2005, that some co-workers raised more serious concerns

---

[4] Plaintiff disputes Simeone's assertion that her storage locker was an hour outside of her territory.  (See C.S.F. ¶ 27.)

about her job performance.  (Id.)  Plaintiff was unaware that her co-workers accused her of recording calls she did not make.  (Id.)

Simeone asserts that he spoke with Ron Rebel ("Rebel") with respect to plaintiff's job performance and that Rebel informed him plaintiff said that if she did not leave her territory by 2:30 p.m. or 3:00 p.m., she would not get home until approximately 7:00 p.m.  (Id. ¶ 30.) Plaintiff denies the discussion with Rebel ever took place.  (Id.)  Simeone asserts that Rebel raised concerns that plaintiff had not made a number of the physician calls that she reported; and when Rebel confronted her about these allegations, she denied any misconduct.  (Id. ¶ 31.) Plaintiff disputes these facts.  (Id.)  Simeone began an investigation into plaintiff's call records and consulted with Kyle during the investigation.  (Id. ¶ 33.)

BIPI uses software called VISTA to track and manage the sales activities of its sales representatives.  (Id. ¶ 17.)  Plaintiff was trained on the use of VISTA and knew how to use the software.  (Id.)  Plaintiff understood that she was expected to record physician sales contacts into VISTA on a daily basis.  (Id. ¶ 18.)  According to the National Standards for Field Sales, and BIPI policy, a face-to-face physician contact is defined as a face-to-face call with a practicing physician during which there is a discussion or dissemination of product information.  (Id. ¶ 19.) The Guide provides that falsifying daily physician contacts is unacceptable and will result in discipline, up to and including termination.  (Id. ¶ 21.)  BIPI Corporate Policy and its Business Conduct and Ethics Policy likewise provides that falsification of reports and falsifying daily physician contacts is unacceptable conduct and will result in dismissal.  (Id. ¶ 23.)

During the course of the investigation of plaintiff's call records, Simeone observed, among other things, that plaintiff recorded a face-to-face physician call with Dr. Diana Lemley ("Dr. Lemley") on November 3, 2005.  (Id. ¶ 34.)  Simeone alleges that the November 3, 2005

call was suspicious because he knew Dr. Lemley from calling her when he was a sales representative with BIPI. (Id. ¶ 35.) Simeone recalled that Dr. Lemley frequently attended the Update, which had taken place on November 3 and 4, 2005. (Id.)

Simeone asserts that he called Dr. Lemley's office to determine if Dr. Lemley was in her office on November 3, 2005. (Id. ¶ 36.) Simeone learned that Dr. Lemley was at the Update on November 3 and 4, 2005, and was out of the office on both days. (Id.) Simeone requested a letter from Dr. Lemley's office confirming that she was out of the office on November 3, 2005 and they sent him a letter confirming this fact. (Id.)

On November 16, 2005, Simeone and Floyd held a meeting with plaintiff in order to gather information on issues concerning plaintiff's job performance, particularly her call records. (Id. ¶ 37.) Plaintiff did not know the purpose of the meeting beforehand. (P.S.F. ¶ 78.) Simeone and Floyd discussed several issues with plaintiff during the November 16, 2005 meeting and questioned her about the November 3, 2005 call with Dr. Lemley. (C.S.F. ¶ 38.) They asked if she had made the call and she replied that she did. (Id.)

Simeone questioned plaintiff about whether she had lunch with Dr. Lemley on November 3, 2005. (Id. ¶ 81.) Plaintiff informed Simeone that she could not remember whether she took Dr. Lemley to lunch on the day in question and would need to check her receipts. (Id.) Simeone asserts that plaintiff explained she had lunch with Dr. Lemley on November 3, 2005. (C.S.F. ¶ 38.) Plaintiff denies telling either Simeone or Floyd that she had lunch with Dr. Lemley on November 3, 2005. (C.S.F. ¶ 38.)[5]

Simeone and Kyle assert that plaintiff stated she might have stopped by Dr. Lemley's office, talked with her staff, and left some literature, even if she did not speak with Dr. Lemley.

---

[5] Simeone asserts that after plaintiff allegedly confirmed having lunch with Dr. Lemley, plaintiff subsequently "back-pedaled" and stated that she may not have had lunch with Dr. Lemley on November 3, 2005. (C.S.F. ¶ 39.)

(Id. ¶ 40.)  Kyle stated that plaintiff said "you could find things on everybody if you really look."

(Id.)  Plaintiff denies making this statement.  (Id.)

Plaintiff maintained during the discussion that if she recorded a call in VISTA for

November 3, 2005, then she had a meeting with Dr. Lemley on that date.  (Id. ¶ 41.)  Plaintiff felt

"blindsided" by the meeting and was not given an opportunity to review her appointment book or

expense records.  (P.S.F. ¶ 85.)  Plaintiff believed she responded adequately to all issues raised in

the meeting.  (Id.)

Simeone, Floyd and Kyle assert that they terminated plaintiff on November 18, 2005,

because she could not adequately explain how she made a face-to-face call on November 3, 2005

with Dr. Lemley.  (C.S.F. ¶ 45.)  Plaintiff responds that she did not understand she was being

terminated for falsifying her November 3, 2005 call to Dr. Lemley.  (P.S.F. ¶ 87.)  Plaintiff

asserts she was terminated at the age of forty-seven solely because of the single call to Dr.

Lemley she reported.  (Id. ¶ 88.)

Simeone testified that he would not have terminated plaintiff and would have further

investigated, if either plaintiff or Dr. Lemley had told him that they met at the November 3, 2005

Update.  (Id. ¶ 89.)  Simeone testified that he did not ask plaintiff whether she attended the

Update because it "wasn't even a point in his mind."  (Id. ¶ 90.)  Simeone did not question any

other sales representatives to determine whether plaintiff actually attended that Update.  (Id.)

Plaintiff obtained an affidavit from Dr. Lemley.  (Id. ¶ 93.)  Dr. Lemley considered

plaintiff to be a conscientious and enthusiastic sales representative.  (Id.)  In her affidavit, Dr.

Lemley stated:

> Becky Palamides has advised me that she spoke with me at the
> UPMC Update on November 3, 2005 and gave me an invitation to
> an upcoming dinner program.  Although I do not specifically
> remember meeting with Becky Palamides on November 3, 2005,

I have no reason to believe that such interaction did not occur.

(Id. ¶ 94.)

Plaintiff requested an exit interview with BIPI's human resource department.  (Id. ¶ 92.) At the interview plaintiff informed the human resources representative that she felt isolated and treated differently because of her age.  (Id.)

### E. Plaintiff's replacement

Jacklyn Hucko ("Hucko"), age twenty-six, submitted an application to BIPI on November 6, 2005. (Id. ¶ 95.)  Simeone spoke with her regarding a position on November 15, 2005.  (Id. ¶ 96.)  Hucko officially received an employment offer from BIPI on November 28, 2005.  (Id. ¶ 97.)

### F.  Simeone's ageist comments

In 2002, Simeone was a sales representative with BIPI, and reported to DM Carl Gianelli ("Gianelli").  (C.S.F. ¶ 74.)  At some point in 2002, Gianelli held a meeting for his district.  (Id. ¶ 75.)  A number of other representatives attended the meeting in a Pittsburgh, Pennsylvania area hotel.  (Id.)  During the meeting, there was a review and discussion about the sales figures of the sales representatives, which were printed for everyone in attendance.  (Id. ¶ 76.)  In reviewing the sales statistics, Simeone misinterpreted the sales figures and mistakenly concluded that the more experienced, longer-tenured sales representatives were not performing as well as some of the more recently hired representatives.  (Id. ¶¶ 77-78.)  Simeone stated, "when I become a DM, I'm not going to hire anyone over 40."  (Id. ¶ 77.)  After being informed that the longer-tenured workers had outperformed the younger sales representatives, Simeone stated, "then I'm not going to hire anyone under 40."  (Id. ¶ 78.)

Dan Thomas ("Thomas"), a BIPI sales representative for over thirty years, testified that Simeone made similar statements against longer-tenured employees at the Pittsburgh International Airport in the presence of three other sales representatives. (P.S.F. ¶ 99; Pl.'s Br. (ECF No. 63) at 2.) Thomas further testified that Simeone's ageist comments were a matter of concern among the older BIPI sales representatives because the employees believed Simeone was on a management track. (P.S.F. ¶ 101.)

In 2003, in connection with BIPI's investigation of another employee's complaint, BIPI learned about Simeone's 2002 age-related comments. (C.S.F. ¶ 83.) Simeone was counseled and received a written warning that such conduct violated BIPI policy and further conduct could result in more serious disciplinary action, including the possibility of termination. (Id.)

Plaintiff did not witness Simeone's comments, and the comments were not about her or directed at her. (Id. ¶ 82.) Plaintiff was not an employee of BIPI at the time Simeone made such remarks. (Id.)

**G. Simeone's hiring trend**

Jody Removchik ("Removchik") was a DM with BIPI from January to June 2005. (P.S.F. ¶ 109.) She reviewed resumes and interviewed applicants as a team with Simeone. (Id.) Removchik believed that Simeone preferred younger sales representatives as opposed to older sales representatives. (Id. ¶ 110.)

Simeone has not terminated any BIPI employee over the age of 40, with the exception of plaintiff. (C.S.F. ¶ 86.) Between January 1, 2003 and January 1, 2006, Simeone terminated three employees. (Id. ¶ 87.) Simeone terminated plaintiff, as well as sales representatives Mark Villasenor ("Villasenor") and Kristina Graham ("Graham") for unsatisfactory performances. (Id. ¶ 87.). Villasenor was thirty-two and Graham was twenty-eight at the time they were terminated.

(Id. ¶ 88.) Simeone hired fifteen sales representatives whose ages ranged between twenty-four and thirty-seven. (P.S.F. ¶ 111.) None of these fifteen sales representatives hired by Simeone were forty years of age or older. (Id.)

Plaintiff hired Dr. Joseph B. Kadane ("Dr. Kadane") to offer his expert opinion with respect to Simeone's hiring trends. (Id. ¶ 112.) When Dr. Kadane performed his analysis, he first compared the ages of the sales representatives hired by Simeone during the relevant period with the ages of the sales representatives hired in the rest of Region 17 during the same period. (Id. ¶ 113.) Dr. Kadane compared the ages of the eleven sales representatives who reported to Simeone at the end of the relevant period with the ages of the sales representatives in the rest of Region 17 as of that date. (Id.) Kadane concluded:

> In comparison with the rest of Region 17, both Simeone's hiring decisions and his workforce were remarkable for their lack of persons over forty. As a result, older workers were disproportionally disadvantaged in comparison with the rest of Region 17.

(Id. ¶ 114.)

### H. Simeone's favorable treatment of younger employees

Plaintiff identified five individuals, all under the age of 40, who were given favorable treatment in comparison to plaintiff: Monica Reisz ("Reisz"), Ryan Williams ("Williams"), Erin Trout ("Trout"), Mr. Rebel, and Julie Kresen ("Kresen"). (Pala. Dep. at 277-81.) Reisz, age thirty-seven, was not fired for falling behind in logging her physician calls. (P.S.F. ¶ 116.) Reisz in March 2005 was not required to transfer to the Pittsburgh City Territory despite already residing in the territory. (Id.) Williams and Mr. Rebel, both under the age of 40, were permitted to leave work early. (Id. ¶ 118.) Kresen was not disciplined for incorrectly entering a physician call. (Id. ¶ 119.)

On July 18, 2003, Simeone offered Trout, age twenty-seven, a position as a sales representative in the Pittsburgh Southwest Territory.  (Id. ¶ 4.)  Trout resided in Mt. Pleasant, which is outside the geographical boundaries of the Pittsburgh Southwest Territory.  (Id. ¶ 21.)  Kyle did not explain why it was a better fit to relocate Trout to the Pittsburgh Southwest Territory, rather than assign plaintiff to that territory.  (Id. ¶ 23.)

III.    **Standard of Review**

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.
>
> …
>
> **(c) Procedures.**
>
> **(1)** *Supporting Factual Positions***.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

> party's case, and on which that party will bear the burden of proof
> at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23). The United States Supreme Court has emphasized that

> "[w]hen the moving party has carried its burden under Rule 56(c),
> its opponent must do more than simply show that there is some
> metaphysical doubt as to the material facts . . . . Where the record
> taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Abington, 242 F.3d at 446; Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## IV. Discussion

**A. Discrimination claim under the ADEA – General Framework**

The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). In cases where there is no direct evidence of discrimination, the United States Court of Appeals for the Third Circuit applies the burden-shifting analysis set forth in McDonnell Douglas. See Barber v. CSK Distrib. Servs., 68 F.3d 694 (3d Cir. 1995).

Under this analysis, a plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254. If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production – but not the burden of persuasion – shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson, 142 F.3d at 644 n.5. The defendant can satisfy this burden by offering evidence of a nondiscriminatory reason for its action. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant offers a legitimate, nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). The McDonnell Douglas burden-shifting analysis is applied to ADEA cases where no direct evidence of discrimination is introduced. Smith v. Allentown, 589 F.3d 684 (3d Cir. 2009) (when no direct evidence of age discrimination is presented, the McDonnell Douglas burden-

shifting framework is applicable and that application is not affected by <u>Gross v. FBL Financial</u> <u>Servs.</u>, 129 S. Ct. 2343 (2009) (mixed-motive doctrine does not apply to ADEA claims)).

**B. Prima facie case**

To establish a prima facie case under the ADEA, the plaintiff must show that (1) she is age forty or older; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a sufficiently younger person or a younger, similarly situated employee. <u>Simpson</u>, 142 F.3d at 644.

In the present case, BIBI does not dispute that plaintiff can establish a prima facie case pursuant to the ADEA. At the time plaintiff was hired, she was forty-five years of age. She was terminated at the age of forty-seven. Thus, she is able to satisfy the first element to establish a prima facie case pursuant to the ADEA because at age forty-seven she was a member of the protected class.

With respect to the second element, plaintiff was qualified for the position. Plaintiff was employed by BIPI for over two years and received two achievement awards. She routinely received positive feedback in her performance reviews. Plaintiff only received negative comments and criticism a month prior to her termination.

With respect to the third element, plaintiff suffered an adverse employment action because she was terminated by BIPI. Finally, as to the fourth element, plaintiff was replaced by an employee who was twenty-six years of age when she was hired; the replacement was approximately twenty-one years younger than plaintiff. Under these circumstances, plaintiff satisfies all the elements to make out a prima facie case.

**C. Legitimate nondiscriminatory reason**

In an age discrimination case, once a plaintiff has established a prima facie case of age discrimination, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the plaintiff's rejection. See McDonnell Douglas, 411 U.S. at 802. The defendant must produce evidence that the plaintiff was rejected, or, that someone else was preferred, for reasons that are legitimate and nondiscriminatory. Burdine, 450 U.S. at 254. The Supreme Court has held that this step does not require the employer to disprove a discriminatory motive, but merely to state a "legitimate, nondiscriminatory" motive for its employment action. Mease v. Wilmington Trust Co., 726 F. Supp. 2d 429, 436 (D. Del. 2010) (citing Bd. of Trustees v. Sweeney, 439 U.S. 24, 26 (1978)).

BIPI's proffered reason for terminating plaintiff was that she falsified her call records. BIPI personnel conducted an investigation into the plaintiff's call records because of concerns raised by her co-workers. Several employees raised concerns about plaintiff's job performance. It was alleged that she left her designated territory during hours she was required to be physically located in the territory and did not attend meetings. Simeone was told that plaintiff did not actually make calls that she recorded in her call log.

During the course of the investigation, Simeone observed that plaintiff recorded that she made a call to Dr. Lemley on the same day as the November 3 and 4, 2005 Update. Simeone had once been a sales representative and knew Dr. Lemley. Simeone was aware that Dr. Lemley often attended the Update. Simeone contacted Dr. Lemley's office and received a letter confirming she was out of the office the day she was allegedly contacted by plaintiff. At a meeting with Simeone and Floyd on November 16, 2005, plaintiff said she made a call to Dr. Lemley on that date.

The National Standards for Field Sales provides that falsifying daily physician contacts is unacceptable and will result in discipline, up to and including termination. BIPI Corporate Policy and its Business Conduct and Ethics Policy likewise provide that falsification of reports and falsifying daily physician contacts is unacceptable conduct and will result in dismissal. Under these circumstances, BIPI's stated reason is a legitimate and nondiscriminatory reason for terminating plaintiff.

### D. Pretext

After the defendant satisfies its burden of production to demonstrate a legitimate nondiscriminatory business reason for the employment decision, the burden of production shifts back to the plaintiff to show that the "employer's proffered reason [for the employment action] was not the true reason for the . . . decision," but was instead mere pretext for discrimination. Mease, 726 F. Supp. 2d at 436; see Stewart v. Rutgers, 120 F.3d 426, 432 (3d Cir.1997) (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 508 (1993)).

The plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (citing Fuentes, 32 F.3d at 764. Plaintiff must do more than show that the employer was wrong or mistaken. Tomasso, 445 F.2d at 706.

### 1. Prong One

A plaintiff must submit evidence that could cause a reasonable fact-finder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial. To discredit the employer's articulated reason, the plaintiff

does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 764 (3d Cir. 1995), or produce additional evidence beyond her prima facie case. <u>Fuentes</u>, 32 F.3d at 764. The plaintiff must, however, demonstrate such

> weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder *could* rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'

<u>Fuentes</u>, 32 F.3d at 765 (quoting <u>Josey v. John R. Hollingsworth Corp.</u>, 996 F.2d 632, 638 (3d Cir. 1993)) (internal quotation omitted).

The question in prong one of the <u>Fuentes</u> test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. <u>Keller v. ORIX Credit Alliance</u>, 130 F.3d 1101, 1109 (3d Cir. 1997). Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it. <u>Wildi v. Alle-Kiski Medical Center</u>, 659 F. Supp. 2d 640, 670 (W.D. Pa. 2009).

In the case at hand, plaintiff argues that defendant's nondiscriminatory, legitimate reason was a pretext for age discrimination. Plaintiff is unable to satisfy the first prong because the defendant's stated reason for plaintiff's termination is not so implausible that a fact-finder could disbelieve the reason. BIPI articulated a legitimate nondiscriminatory reason for terminating plaintiff.

Simeone conducted an investigation into plaintiff's call records because he received complaints from several of plaintiff's co-workers. During the course of the investigation, Simeone noticed that plaintiff had recorded a call to Dr. Lemley on November 3, 2005. Since

Simeone used to be a sales representative, he was familiar with Dr. Lemley and knew she frequently attended the Update. Thus, it was not implausible that he concluded plaintiff's call to Dr. Lemley on November 3, 2005, the same day as the Update, was suspicious.

Simeone obtained a letter from Dr. Lemley's office that Dr. Lemly was not in her office on November 3, 2005. On November 16, 2005, during a meeting with Simeone and Floyd, plaintiff was asked if she made the call to Dr. Lemley and she replied that she had made the call. The parties dispute what else was said by plaintiff during that meeting. The "he said she said" dispute involves questions of credibility that this court cannot resolve at the summary judgment stage. Abington, 242 F.3d at 446. When there is a dispute the facts must be viewed in favor of plaintiff, the nonmoving party. Simpson, 142 F.3d at 643 n.3. The court must therefore consider for purposes of resolving this motion that plaintiff did not make statements that she took Dr. Lemley to lunch or back-pedaled from her statement that she made the call.

There is no evidence of record that plaintiff informed Simeone that she attended the Update on November 3, 2005. Plaintiff offered some evidence to prove she attended the Update, i.e., (1) an affidavit from Dr. Lemley, who could not remember interacting with plaintiff at the November 3, 2005 Update, but believed plaintiff who said they met there; (2) an expense report that listed off street parking on November 3, 2005; and (3) her planner. There is no evidence that plaintiff provided this information to BIPI prior to her termination. Therefore, that evidence was not known to BIPI when the decision was made to fire plaintiff. Thus, even crediting plaintiff's statement that she did not equivocate in her statement that she made the call it was plausible that Simeone concluded that she knowingly falsified her call records since he had information that Dr. Lemley was not in her office on November 3, 2005.[6]

---

[6] Plaintiff filed an EEOC Charge on June 19, 2006, based on her termination. She did not mention on November 3, 2005, that she attended the Update on November 3, 2005, or that she saw Dr. Lemley at that Update.

BIPI Policy provided that falsifying records will result in termination. The reason articulated for plaintiff's termination is not so implausible that a reasonable fact-finder would find it "unworthy of credence." <u>Fuentes</u>, 32 F.3d at 765.

## 2. Prong Two

The court must next examine the second prong of the <u>Fuentes</u> framework to determine if plaintiff presented sufficient evidence of pretext. This prong permits the plaintiff to survive summary judgment if he or she can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'' <u>Wildi</u>, 659 F. Supp. 2d at 670 (citing <u>Fuentes</u>, 32 F.3d at 762).

With respect to this prong, the United States Court of Appeals for the Third Circuit has stated:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with *sufficient probative force* that a factfinder could conclude by a preponderance of the evidence that [the protected activity] was a motivating or determinative factor in the employment decision.

<u>Wildi</u>, 659 F. Supp. 2d at 671 (citing <u>Simpson</u>, 142 F.3d at 644–45) (emphasis added).

The court of appeals directed that the kinds of evidence that may be relied upon under this prong of the <u>Fuentes</u> analysis are: (i) whether the employer previously discriminated against the plaintiff; (ii) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and (ii) whether the employer has treated more favorably similarly situated persons not within protected class. <u>Id.</u>

## i. Previous discrimination against plaintiff

There is no evidence of record that BIPI or any of its employees previously discriminated against plaintiff. Plaintiff points to Simeone's ageist remarks. Plaintiff, however, was not

present when Simeone uttered the remarks, and was not even employed by BIPI at the time. Plaintiff asserts the remarks were made against a class to which she belongs – employees 40 years of age or older. Because those remarks were made prior to plaintiff's hiring, the remarks were not made in her presence, and Simeone was not a manager at the time, the comments are considered stray remarks. There is no decision by the Court of Appeals for the Third Circuit which found that stray remarks, standing alone, could be viewed as sufficient to establish pretext under the second prong of the <u>Fuentes</u> test. Instead, there must be substantial supporting evidence other than the isolated remarks to support the denial of summary judgment. <u>Agogbua v. Abington Mem'l Hosp.</u>, No. 03-6897, 2005 WL 1353612, at *7 (E.D. Pa. May 21, 2005). Here, there is no such substantial supporting evidence to show previous age-based discrimination against plaintiff.

### ii. Discrimination against others

Plaintiff offers evidence of Simeone's prior ageist remarks as evidence to show that BIPI discriminated against others in plaintiff's protected class. According to Thomas, Simeone made ageist remarks in the presence of several employees who were 40 years of age or older. Plaintiff, however, did not present any evidence of employees 40 years or older who were terminated by BIPI. In fact, plaintiff was the only employee over the age of 40 who was ever fired by Simeone. Thus, there is no evidence to support the accusation that BIPI or any of its employees discriminated against other persons within plaintiff's protected class.

### iii. Similarly situated employees more favorably treated

Finally, plaintiff claims that similarly situated employees not within the protected class were more favorably treated. When analyzing a plaintiff's arguments of pretext, a court also

considers whether a plaintiff has demonstrated that similarly situated younger persons were more favorably treated.  Simpson, 142 F.3d at 645.

Plaintiff argues that Reisz was treated more favorably because she was not terminated for falling behind in logging her physician calls. Plaintiff contends that Williams and Rebel were treated more favorably in that they were permitted to leave work early. Plaintiff also asserts that Kresen was treated more favorably because she was not disciplined for incorrectly entering a physician call.

Plaintiff, however, failed to show any evidence of other BIPI employees who allegedly engaged in knowingly falsifying call records that were not terminated.  None of the employees she points to as comparators were alleged to have intentionally falsified records.  There is simply no evidence that any employee, under the age of 40, who was alleged to have intentionally falsified records, was not terminated as a result.  "A plaintiff's subjective opinion that she was treated unfairly is not enough to show pretext.  Rather, the *evidence of record* must support a finding that the defendant 'made up' its reason." Menta v. Community College of Beaver Cnty., 428 F. Supp. 2d 365, 376 (W.D. Pa. 2006) (quoting Castleman v. Acme Boot Co., 959 F.2d 1417, 1422 (7th Cir. 1992)).  Plaintiff's subjective belief that other employees were treated more favorably for reasons unrelated to the business reason for her termination does not support a finding of pretext under this prong of the Fuentes test.  See Id.

Additionally, in support of plaintiff's claim that Simeone fired her because of her age and that Simeone preferred younger employees, plaintiff introduced Dr. Kadane's report to provide statistical evidence that Simeone's practices with respect to hiring and firing were consistent with his prior ageist comments. This court has already ruled that Dr. Kadane's report is

admissible.[7] Plaintiff was the only employee terminated by Simeone over the age of 40.

Simeone's statement that he would "fire anyone over 40," (C.S.F. ¶ 77) is weighed against his

statement that he would "fire anyone under 40." (Id. ¶ 78.) Firing only one person over the age

of 40 – when he also fired others under the age of 40 for different reasons – is not sufficient

evidence for a reasonable juror to find pretext.

Simeone, during the same years in question, hired fifteen sales representatives whose age

ranged from between twenty-four to thirty-seven. None of the fifteen sales representatives were

over the age of 40. Dr. Kadane, however, did not list the ages of employees who applied for

these jobs with BIPI. There is no evidence to show that people over the age of 40 applied for

jobs at BIPI while Simeone was a DM. Thus, the statistics, standing alone, do not show that

Simeone preferred or more favorably treated employees under the age of 40.

## Conclusion

---

[7] Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the tier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or date, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. CIV. P. 702.

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), district courts are to perform a "gatekeepers" function with respect to the admissibility of expert testimony. In the Third Circuit, the trial court's role as "gatekeeper" announced in Daubert requires proof that: (1) the proffered witness is qualified as an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must "fit" the facts of the case. In re Paoli R.R. PCB Litig., 25 F.3d 717, 741-42 (3d Cir. 1994).

This court ruled that Dr. Kadane is qualified as an expert in the field of statistics. This court further held that Dr. Kadane's testimony and report are about matters requiring scientific, technical, or specialized knowledge. Finally, this court ruled that Dr. Kadane's testimony "fits" the facts of this case." Dr. Kadane's opinion is based on whether statistics reveal a pattern and practice of discriminatory hiring and firing consistent with Simeone's prior statements. Because this information implicates a possible discriminatory motive with respect to hiring and termination, the court ruled that Dr. Kadane's testimony fits the facts of this case.

Plaintiff failed to produce evidence that her termination from BIPI was pretext for unlawful discrimination. Thus, summary judgment must be granted in favor of defendant.

By the court:

<u>/s/ JOY FLOWERS CONTI</u>
Joy Flowers Conti
United States District Judge

Dated: March 18, 2011